IN THE U.S. DISTRICT IN AND FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

AMERICAN TRADITIONS INSURANCE COMPANY,
as subrogee of Charles Channell and Norma Channell,

       Plaintiff,                               Case No:  6:12-cv-1639-Orl-19TBS

v.

WHIRLPOOL CORPORATION, a Delaware corporation,
EMERSON ELECTRIC COMPANY, a Missouri corporation,
and THERM-O-DISC, INC., an Ohio corporation,

       Defendants.

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT, THERM-O-DISC, INC.'S, MOTION TO STRIKE PORTIONS OF PLAINTIFF'S EXPERT, JACK SANDERSON, REPORT AND LIMIT TESTIMONY AND INCORPORATED MEMORANDUM OF LAW**

The Plaintiff, American Traditions Insurance Company, as subrogee of Charles Channell and Norma Channell (hereinafter American Traditions"), by and through its undersigned counsel, file Plaintiff's Response in Opposition to Defendant's Motion to Strike Portions of Plaintiff's Expert, Jack Sanderson's, Report, as follows.

**I.    FACTUAL BACKGROUND**

This law suit arises from a December 8, 2008 fire that originated inside a five year old (5) electric dryer manufactured by Defendant Whirlpool (formerly Maytag) that destroyed Charles and Norma Channell's home.  On December 2, 2008 American Traditions had in place a contract of insurance under policy number ATM102264 (hereinafter the "Policy") issued in favor of its named insureds, Charles and Norma Channell, covering, among other things, real and personal property damage and additional living expenses for the property at 3477 Banberry Circle, Zellwood, Florida.

At the time of the fire the electric dryer was approximately 5 years old. It is undisputed that the electric dryer was manufactured by Maytag, who was later acquired by Defendant Whirlpool (hereinafter referred to as "Whirlpool"). It is also undisputed that the electric dryer was manufactured using and incorporating an operating thermostat manufactured by Emerson and/or its subsidiary Therm-O-Disc. See Def. Mot. to Strike p. 2 Doc. 47.

At the time of the fire, the electric dryer was being used for its expected, foreseeable and intended purpose, to dry the Channell family laundry. See excerpts from the deposition of Norma Channell are attached hereto as **Exhibit E**. At the time of the fire Charles and Norma Channell lived in their home with their adult son, Jay Channell, who was severely disabled due to renal failure and kidney disease. (See Ex. E). Mr. and Mrs. Channell were both retired and Jay Channell was on disability and was not employed. Mrs. Channell testified that she was primarily responsible for washing and drying the clothes for her husband and her son and she only used the dryer approximately two or three times a week. (Depo. Norma Channell at 29:10-24). Prior to the fire she testified that she never had any problems with the dryer, observed any signs of overheating, or smelled any burning odor. Id. According to Mrs. Channell the dryer had never malfunctioned, required repair, or otherwise not operated properly.

The night before the subject fire, Jay Channell told Mrs. Channell that his clothes were in the dryer and that he'd heard a loud noise when the dryer went off. (Depo. Norma Channell at 20). Mrs. Channell went to the dryer and helped her son remove his clothes and testified that she did not smell anything out of the ordinary, neither the clothes nor the dryer were hot to the touch, and she did not observe any indication that there was a problem with the dryer. Id.

The next day Mrs. Channell washed a load of laundry. After the wash completed and before putting her clothes in the electric dryer she remembered that her son had heard a loud

noise from the electric dryer the night before. Id. at 20. She attempted to start the dryer to make sure it was working properly but it did not start when she pushed the on button. Id. at 68. She adjusted the temperature control and pushed the start button again and the dryer turned on but made a loud noise. Id. at 67-68. She turned the dryer off, unplugged the dryer and left the room to find her documents to call Maytag. Id. Within minutes she heard a loud sound described as a "whoosh" and went to the laundry room to discover flames coming from inside the dryer. Id.

As a result of the fire, the Channell home was destroyed. The Policy provided coverage for the fire loss in question and under the policy American Traditions paid to or on behalf of Mr. and Mrs. Channell $116,812.30 as a result of damages caused by the fire. American Traditions filed the underlying lawsuit as the subrogee for its named insureds Charles and Norma Channell and is the real party in interest in this case. [Doc. Rec. 1].

### A. Current Status of Litigation and Discovery.

The Plaintiff filed the instant lawsuit seeking damages under strict product liability and negligence against Whirlpool, the manufacturer of the dryer, and Emerson and Therm-O-Disc, the manufacturer of the thermostat. [Doc. of Rec. 1]. This litigation is currently in the discovery phase, discovery is ongoing and the deadline for discovery to be completed is set for December 17, 2013. [Doc. of Rec. 3].

On or about June 18, 2013 Plaintiff served Defendant with its written designation of expert witness and expert report. Notably, Defendant already knew that Plaintiff's expert was Jack Sanderson of Fire Findings Investigations, Inc. and had been provided a copy of the written report almost a year before June 18, 2013 disclosure.

In compliance with Fed. R. Civ. P. 26(a)(2)(A) and (B) Plaintiff served Defendant with:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them contained in a 4 page written report;

 (ii) the facts or data considered by the witness in forming them;

 (iii) 19 pages of color photos Mr. Sanderson relied on to support his conclusions and expects to use at trial as exhibits to summarize or support his opinions and conclusions;

 (iv) Mr. Sanderson qualifications, including a list of all publications authored in the previous 10 years, including specific qualifications and publications related to fires caused by defective dryers;

 (v) a list of all other cases in which, during the previous 4 years, Mr. Sanderson testified as an expert at trial or by deposition; and

 (vi) a statement of the compensation to be paid for the study and testimony in the case.

A complete copy of Plaintiff's expert witness designation, including Mr. Sanderson's qualifications, list of all publications, list of other cases he testified as an expert in the last 4 years, and a statement of compensation to be paid for his testimony in this case is attached hereto as **Exhibit A**. A copy of Mr. Sanderson's written expert report and photographs is attached here to as **Exhibit B.**

On July 15, 2013 the Defendant, Therm-O-Disc filed a motion to strike certain portions of Mr. Sanderson's written report and limit his testimony arguing that Mr. Sanderson's written report is deficient and does not satisfy the minimum requirements set forth under Rule 26(a)(2)(B). See Def. Mot. to Strike Doc. of Rec. 47. The Defendant has not yet disclosed its expert witness or produced its expert report; the deadline for Defendant to comply with disclosure of experts is set for August 2, 2013.

 **B. Plaintiff's Pre-litigation Disclosure of Expert Witness and Expert Report to Defendants.**

The Defendant admits that it was provided with a copy of Mr. Sanderson's expert report before Plaintiff filed the instant lawsuit. Plaintiff disclosed Mr. Sanderson as its expert and produced a copy of the March 2012 report to representatives for each Defendant in a final

4

attempt to resolve this subrogation without the necessity of expensive and time consuming litigation.  See Def. Mot. to Strike Doc. of Rec. 47, fn 4.

Defendant's argument that Plaintiff's expert report is insufficient under Rule 26(a) is based almost entirely on that fact that Mr. Sanderson's expert report was created and signed on March 6, 2012, prior to the Plaintiff filing the instant lawsuit.  Def. Mot. to Strike Doc. of Rec. 47, pg. 6-7.  Based solely on the date of the report Defendant erroneously concludes that "Mr. Sanderson has done nothing further" in support of his conclusions asserted in the March 2012 report.  Further incorrectly declaring, "Mr. Sanderson has done nothing, including conduct any testing, to investigate the design and/or manufacture of the subject dryer/thermostat."  Def. Mot. to Strike Doc. of Rec. 47, pg. 7.

As noted in his written report dated March 6, 2012, Mr. Sanderson was provided with and reviewed all the documents, reports, photographs, and exhibits related to the fire cause and origin investigations undertaken prior to his involvement. (Ex. B).  In that report he also notes that he performed an inspection and examination of the physical evidence in February 2012 before forming his opinions and conclusions regarding the cause of the subject fire. (Ex. B).

In declaring that Mr. Sanderson has done "nothing" since March 2012 to confirm his conclusions, Defendant seems to overlook that fact that In September 2012 the parties to this lawsuit conducted a **second** joint destructive examination of the physical evidence.  (The first destructive examination of the electric dryer was performed by representatives for American Traditions and Whirlpool in November 2009).  On September 14, 2012 representatives on behalf of American Traditions, Whirlpool, and Thermo-O-Disc were present at this second joint examination of the physical evidence.  A copy of the sign in sheet from the September 14, 2012 joint examination is attached hereto as **Exhibit D.**

Defendant's argument that Mr. Sanderson's March 2012 report is legally insufficient because the report was authored prior to the Plaintiff filing this underlying lawsuit is misleading and wholly unpersuasive.  Mr. Sanderson only completed the March 2012 written report after: 1) a thorough inspection of the physical evidence; 2) a review of the cause and origin fire investigator's report dated January 21, 2009; 3) a review of the November 24, 2009 report by HSA regarding the initial joint destructive examination of the evidence, which was attended by a representative present on behalf of Whirlpool, Steve Vogt; 4) color photographs from the prior fire scene inspection and joint destructive examination; 5) the fire report from the fire department that responded to the fire; and 6) the reports from Norton Adjusting Company.  As of the date of this motion no additional evidence has presented in this case to change the opinions and conclusions asserted in Plaintiff's expert report.

**C.     Defendant's argument that Mr. Sanderson has done nothing since the filing of the lawsuit is false, misleading and wholly unsupported.**

Defendant argues that after being retained in this case Mr. Sanderson did "nothing" more than review reports previously issued, review photographs, review the Fire incident report prepared by the local fire department, and inspect the subject dryer at his facility.  This argument is false, misleading and contradicted by the facts in this case.  Defendant completely ignores the fact that the Defendants and Defendants experts were present at the joint examination of the evidence on *September 14, 2012* that occurred at Jack Sanderson's facility.  (Ex. D).  As such Mr. Sanderson inspected the physical evidence not one time, but two different times.

In further support of its contention that Mr. Sanderson has done "nothing further", Defendant makes the outlandish and completely unsupported allegation that Mr. Sanderson did not "even" review Norma Channell's deposition testimony, which was taken on May 7, 2013.  Def. Mot. to Strike Doc. of Rec. 47, pg. 7.  Defendant asserts this conclusory allegation based on

6

one (1) page of Mrs. Channell's May 7, 2013 deposition wherein she testified that she did not change the temperature setting on the dryer prior to turning the dryer on the day of the fire. (Ex. E Depo. Norma Channell p. 38:6-22).

This specific testimony contradicts the statements that Mrs. Channell made to HSA fire investigator Frank Hutton as stated in his January 2009 written report, relied on by Jack Sanderson in his written report. However, Defendant does not provide a full or accurate summary of Norma Channell's testimony regarding this issue because later in her deposition she testified that she remembered speaking to Mr. Hutton a fire investigator for HSA. (Depo. Norma Channell pp. 63:25 - 64:1-4). When asked about her earlier deposition testimony that she did not change the temperature setting before the fire, she testified that the statements she made to Mr. Hutton in 2008 just after the fire were probably true because her memory about the facts leading up to the fire were better right after the fire when she spoke to Mr. Hutton. (Depo. Norma Channell pp. 64:5-24, 68:1-4).

When the Defendant questioned Mrs. Channell for a second time about whether she changed the temperature setting on the dryer before turning it on she agreed that if Mr. Hutton's report said that she told him that then it was most likely true. Id. She admitted that at the time she provided her statement to Mr. Hutton here memory was much better than at her deposition years after the fire. She also testified that she believed that Mr. Hutton was a truthful man and her memory at the time she spoke to him was better than it is now. (Ex. E Depo. Norma Channell pp. 67- 68).

Defendant's argument that Plaintiff's expert report is insufficient because it fails to consider Mrs. Channell's subsequent deposition testimony is inaccurate and misleading. In fact, Mrs. Channell's later testimony confirms that the statements she gave Mr. Hutton in 2008 and

7

TPCS 860840

2009 were more likely accurate and that if she told Mr. Hutton that she changed the temperature dial, she probably did because her memory of those same were better at the time she spoke to Mr. Hutton.  (Depo. Norma Channell pp. 67- 68).  Based on that testimony Mr. Sanderson had no reason to write another expert report as the information he relied on, the HSA reports recording Mrs. Channell's account of events, were accurate according to Mrs. Channell's own testimony.

## II.     LEGAL ANALYSIS

### A.     Federal Rule of Civil Procedure 26(a) requirements.

Disclosure of expert testimony is governed under Rule 26(a)(2) of the Fed. R. Civ. P. Rule 26(a)(2)(A) requires a party to disclose the identity of any expert it expects to testify at trial. Rule 26(a)(2)(B) mandates that the disclosure of an expert witness be accompanied by a written report.  Rule 26(a)(2)(B) requires that an expert's report contain the "substance of the facts and all opinions to which the expert is expected to testify, and a *summary* of the grounds for each opinion.  Acosta v. Electrolux North Am., 2008 U.S. Dist. LEXIS 103633 (S.D. Fla. 2008)(emphasis added).  The expert disclosure rule is intended to provide opposing parties reasonable opportunity to prepare for effective cross examination and arrange for expert testimony from other witnesses."

Rule 26(a)(2)(B) requires disclosure of six different categories of information:

1. A complete statement of all opinions that will be expressed at trial and the reasons and basis for the opinion.  In simple terminology, this means "how" and "why" the expert reached the conclusions and opinions to be expressed;

2. The data and information considered by the expert.  Again, in simple language, this means "what" the expert saw, heard, considered, read, thought about or relied upon in reaching the conclusions and opinions to be expressed;

3. Any exhibits the expert will use;

8

    4.    Qualifications of the expert, including publications for the past ten (10) years;

    5.    Compensation; and

    6.    A list of other cases in which the expert has testified during the previous four (4) years.

Reed v. Binder, 165 F.R.D. 424, 429 (D.N.J. 1996).

An expert report is adequate under the requirements of Rule 26 when it is "sufficiently complete, detailed and in compliance with the Rules so that surprise is eliminated, unnecessary depositions are avoided, and costs are reduced." Id. The Reed court further explained that the first requirement of the Rule is designed to explain both "'how' and 'why' the expert reached the conclusions and opinions expressed in the written report and to be provided at trial. Id. (See also Reese v. Herbert, 527 F.3d 1253 (11th Cir. 2008).

Defendant argues that Plaintiff's expert report is legally insufficient because Mr. Sanderson authored the report before Plaintiff filed the instant litigation. Defendant contends that the report provides "absolutely no information" as to the nature of the alleged failure, does not state how the dryer/thermostat failed, when it failed, how long it failed prior to the fire, and does not state whether the alleged defect in the electric dryer was a design or manufacturing defect. See Def. Mot. to Strike Doc. of Rec. 47. Defendant's argument is unpersuasive and legally unsupported under Florida strict product liability law.

    **B.**    **Florida Strict Product Liability Law and Plaintiff's Burden of Proof.**

Under Florida law, a plaintiff asserting a strict product liability action is required to prove that (1) a product produced by a manufacturer (2) was defective (3) the defect proximately caused the plaintiff's injury. McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002). That burden of proof can be met using direct or circumstantial evidence. Cassisi v.

9

Maytag Co., 396 So. 2d 1140, 1147 (Fla. 1st DCA 1981). The Cassisi case established a legal inference in Florida strict product liability cases that the product subject to the product liability claim is defective at both the time of injury and the time of sale when that product "malfunctions during normal operation." This inference, generally referred to in Florida as the Cassisi inference, allows proof of product defect under the circumstances that aids a plaintiff in meeting her burden that the product was defective both at the time of the injury and at the time it was within the control of the supplier. This inference arises from the occurrence of the accident itself, the product failure under normal operation. Id. at 1148.

Similar to the facts in the underlying case, in Cassisi the plaintiff filed a lawsuit against the manufacturer of plaintiff's clothes dryer, Maytag, seeking damages that resulted from a fire that originated inside her Maytag clothes dryer. At her deposition Mrs. Cassisi testified that she purchased the dryer approximately 19 months before the fire, no maintenance work or repairs had ever been performed on the dryer and it was used and operated normally to dry laundry. Id. at 1143. On the date of the fire, Mrs. Cassisi left her home with the dryer in operation and when she returned she found the house on fire. Id.

The plaintiff's expert witness was unable to pinpoint a "***specific defect*** within the dryer" because the dryer was badly damaged by fire. Id. (emphasis added). Plaintiff's expert witness opined, based on his review of the fire pattern and because the heat source was the subject dryer, that the fire originated inside the Maytag dryer. Id. He concluded that the fire was caused by "some incorrect functioning of a part that was internal within" the dryer and that the malfunction was caused by an electrical short. Id. at 1152. Other than those opinions, plaintiff's expert could not pinpoint the exact defect or failure mode. Id. The Court held that based on the evidence it was "immaterial that the plaintiffs failed to identify the specific cause of the malfunction"

because it is inferred that the malfunction itself, under these fact, was evidence of the product's defective condition at both the time of the injury and at the time of the sale. Id. at 1153.

Therefore, under Florida law, Plaintiff's expert is not required to identify the specific cause of the malfunction, specific whether the defect was a design or manufacturing defect, or identify the specific failure mode. The Defendant's argument that Plaintiff's expert report is insufficient under Rule 26(a) because it does not specifically identify the specific defect or distinguish whether the defect was a design or manufacturing defect is unsupported under Florida law.

      **C.  Under Florida Law Plaintiff's Expert disclosure and Expert Report Comply with Rule 26(a)(2)(A) and (B).**

The Defendant's motion to strike mischaracterizes Mr. Sanderson's written report, his investigation of the facts, and his opinions and conclusions regarding the failure that occurred inside the Maytag electric dryer. Defendant claims that Mr. Sanderson's written report is legally insufficient and does not comply with the requirements of Rule 26(a) because 1) Mr. Sanderson's report provides "absolutely no information" as to the nature of the alleged failure; 2) provides no information as to how the alleged failure caused arcing; 3) fails to identify the "specific defect" in the dryer and thermostat; and 4) fails to designate specifically whether the failure was due to a "design and/or manufacturing" defect. Def. Mot. to Strike Doc. of Rec. 47, pg. 12-14.

Defendant completely ignores and/or disregards the substance of Mr. Sanderson's written report and those paragraphs that provide detailed information forming the basis and support for his conclusions. Mr. Sanderson's written report is divided into five (5) distinct sections. It begins by listing all the documents, reports, and photographs he reviewed during his

investigation of the cause of the fire at issue in this case. Ex. B pg. 1-2. He also states that on February 22, 2012 he examined the subject dryer in his laboratory facility. Id.

Based on his investigation of the fire loss and the examination of the physical evidence, Mr. Sanderson formed opinions regarding the cause of the subject fire. On page 2 of his report, under the title CONCLUSIONS, Mr. Sanderson lists his conclusions as follows:

> 1. I found obvious evidence of a failure of the operating thermostat for the dryer.
> 2. It is my opinion arcing caused by a failure of the thermostat caused the fire.
> 3. It is my further opinion the dryer and, specifically, its operating thermostat had to be defective for the fire to occur.

Ex. B, pg. 2.

Mr. Sanderson then explains the basis and reasons for forming those conclusions. Following the conclusions, the BACKGROUND section summarizes the relevant facts obtained during the interviews and discussions with Norma Channell. Specifically that her son heard a loud noise coming from the dryer the night before the fire. Norma Channell tried to turn the dryer on the next day and it did not turn on until after she adjusted the temperature control setting, and that she observed the flames coming from beneath the dry immediately. Id.

The background section is followed OBSERVATIONS wherein Mr. Sanderson confirms that that the subject dryer was manufactured by Maytag, who was later acquired by Whirlpool. Mr. Sanderson then describes in detail to physical evidence noting, "distinctive, unalterable physical damage" observed that establishes the cause of this fire. Id. pg. 3. The report then gives a full description of the "distinctive, unalterable physical damage" and explains why and how the physical evidence reveals the cause of the fire. Specifically, the blower housing (depicted in photo 4) is located at the right front bottom corner of the dryer. Also at this location on the dryer is the operating thermostat which is comprised and made up of thermoset plastic.

His examination of the dryer revealed that the operating thermostat was not contained it the mounting cup, but a portion of the metal mounting cup was still present and attached to the dryer. Id. He observed "significant arcing damage to the mounting cup" specifically noting that "the arcing event completely blew out one side of the mounting cup and referencing photographs 5 through 9. Id. at 3 and photographs 4, 5, 6, 7, 8, and 9. Despite Defendant's argument that Plaintiff's expert report "doesn't even attempt to provide any specific information as to the nature of the failure" the observations provided in his report clearly lays out how and why he reached his conclusions that there was a failure of the operating thermostat that caused arcing inside the thermostat that caused the fire.

The observations are followed by DISCUSSION wherein Mr. Sanderson explains that the damage to the mounting cup and remains of the operating thermostat was distinctive and revealed that electrical arcing caused the damage. Id. at pg. 3. He also explains that his opinions regarding the dryer malfunction are supported by Mrs. Channell's testimony that she adjusted the temperature setting after first trying to start the dryer, which likely affected how the resisters in the operating thermostat were energized. Id. at pg. 4.

Mr. Sanderson explains that the thermostat failed and caused the fire because the damage "inside" the body of the thermostat established that the failure "occurred inside the body of the thermostat" and was not caused by fire from outside of the thermostat. Once the operating thermostat failure occurred and arcing began to the grounded mounting cup the molten steel from the cup was thrown off and ignited combustible material adjacent to the mounting cup. Id. Again, in this section he provides Defendant with his reasoning and the basis for his conclusion that the fire was caused by the failure of the dryer's operating thermostat, that failure caused electrical arcing inside the thermostat body that came into contact with the mounting cup that

TPCS 860840

blew out molted steel particles that ignited adjacent line and/or plastic components of the blower housing. Id. at pg. 4.

The written report sufficiently states Mr. Sanderson's opinions regarding the cause of the fire, the failure inside the operating thermostat and thermal mounting cup that caused the fire, and the basis of his opinions. Defendant fails to provide any legal or factual support for its supposition and argument that a plaintiff's expert must re-write or produce a new report <u>after</u> litigation is filed in a product liability case when a report written before the filing of litigation contains the opinions of the expert and the basis and support for those opinions. In this case, Mr. Sanderson's opinions asserted in the March 2012 written report contain the summary of all of his opinions and include the basis for those opinions in this case.

      **D.     Under Florida law the Plaintiff has no Duty to prove the Specific Defect that caused the Product Failure.**

In its motion to strike the Defendant failed to consider the Plaintiff's burden of proof in the underlying strict product liability action as set forth under Florida law in <u>Cassisi v. Maytag</u>. In <u>Worsham v. A.H. Robins Co</u>., 734 F.2d 676 (11th Cir. 1984), the Eleventh Circuit Court of Appeal, relying on the holding in <u>Cassisi</u>, held that absolute positive proof of product malfunction is not necessary where the product is destroyed; provided plaintiff can point to evidence that the cause of the accident most probably originated in the product." <u>Id.</u> at 683. Evidence sufficient to establish a defect can include facts that negate other causes of the accident and at the same time point to the product as the most logical cause." <u>Id</u>.

In <u>McCorvey v. Baxter Healthcare Corp</u>., 298 F.3d 1253 (11th Cir. 2002) the Court found the district court erred in finding that plaintiff's expert's failure to negate alternative grounds of causation, besides a manufacturing defect, was fatal to his strict liability claim. The Court reasoned that although the district court emphasized that the expert affidavits did not pinpoint a

specific defect in the product, Cassisi and its progeny do not require such specificity for a plaintiff to be afforded a legal inference of product defect. The plaintiff was not required and had no obligation to specifically pin point the specific defect once he met the two requirements of Cassisi discussed above.

In the instant case, Mrs. Channell testified that the 5 year old Maytag dryer operated properly, did not malfunction or require repair, and was used properly for its expected and intended purpose of drying clothes for the 5 years before the fire. Days after the fire in an interview with fire investigator, Mr. Hutton, she stated that just before the fire she attempted to turn on the dryer, when it didn't turn on she changed the temperature setting and the dryer turned on immediately making a loud noise. Just minutes later she observed flames coming from the dryer. Mr. Sanderson's expert report concludes that evidence of a failure of the operating thermostat for the dryer and electrical arcing caused by a failure in the thermostat caused the fire. He is under no obligation to pinpoint the exact nature of the failure or whether the defect was a design or manufacturing defect.

The cases cited and relied on in support of Defendant's motion to strike are factually and legally distinguishable and therefore unpersuasive in this case. Specifically, Defendant's reliance on Reese v. Herbert, 527 F. 3d 1253 (11th Cir. 2008) is unpersuasive because in that case the party producing the expert disclosure only ***verbally*** informed the other side of the name of its expert witness and did not produce a written report as required under Rule 26(a)(2)(B). Unlike the facts in this case, in Reese the producing party did not provide a written report but merely produced an affidavit from its expert several weeks after the discovery cutoff date. Reese, 527 F. 3d at 1265.

Likewise, Defendant's reliance on <u>Olmstead, Inc. v. CU Interface, LLC</u>, 606 F. 3d 262 (6th Cir. 2010) is unpersuasive because the facts in that case are distinguishable from those in the underlying case. The <u>Olmstead</u> case involved complicated copy right infringement allegations and the expert submitted a two-page report that summarily stated an opinion and then attached 200 pages of exhibits, apparently without any explanation of their relationship to his conclusory opinion. <u>Moore v. the Weinstein Co.</u>, 2012 U.S. Dist. LEXIS 72929 at *17-18 (M.D. TN 2012). Unlike the report produced in this case, the report examined by the Court in <u>Olmstead</u> appeared to have amounted to nothing more than an "exhibit dump." <u>Id</u>.

In the instant case, Plaintiff's expert report is based on Mr. Sanderson's review of documents relevant to the cause and origin of the fire, including two (2) fire cause and origin reports produced by HSA within 6 weeks of the fire that recorded detailed summaries of witness interviews. He also reviewed the loss adjuster's reports regarding the damages to the Channell's home caused by the fire, he inspected all of the photographs taken by investigators at the time of the fire and when the dryer was originally examined, he reviewed the detailed fire inspection report for the local fire department, and his report also reflects that he performed an examination of the physical evidence. <u>See</u> <u>generally</u> Ex. B. Mr. Sanderson's investigation and the facts revealed during that investigation are the basis of Mr. Sanderson's opinions and conclusions in his report and are sufficiently clear in his report to meet the requirements of Rule 26(a). <u>See</u> <u>Democratic Republic of the Congo v. Air Capital Group, LLC</u>, 2013 U.S. Dist. LEXIS 74136 (May 23, 2013 S.D. of Fla.)

### III. CONCLUSION

Defendant's motion to strike Plaintiff's expert report and limit the testimony of Plaintiff's expert, Jack Sanderson, is devoid of legal or factual support. Under Florida law Plaintiff's expert

report is legally sufficient to inform Defendant's of Plaintiff's expert's opinions and conclusions and how and why he formed those conclusions. Therefore Plaintiff's expert report meets the requirements under Rule 26(a).

Defendant's disagreement with Plaintiff's expert report can be addressed on cross examination and disputed by Defendant's own experts. There is no legal basis to strike Plaintiff's expert report or limit Mr. Sanderson's testimony and Defendant's motion should be denied.

Respectfully submitted,

>GIBSON & SHARPS
>ATTORNEYS AT LAW
>
>By: */s/ Jennifer H. Tedesco*
>Jennifer H. Tedesco, Esq
>Florida Bar No. 0678821
>GIBSON & SHARPS
>1443 20th Street, Suite F
>Vero Beach, Florida 32960
>Telephone: (800) 759-0964
>Fax:  (772) 778-3835
>jht@gibsonsharps.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed using the Court's electronic filing system and has been furnished via ECF notification and email service to the following parties on this 31th day of July, 2013:

Francis H. Brown, III
McGlinchey Stafford PLLC
601 Poydras Street, 12th Floor
New Orleans, LA  70130
fbrown@mcglinchey.com


>*/s/ Jennifer H. Tedesco*
>Jennifer H. Tedesco, Esq.

17

TPCS 860840